IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

VICTORIA WOODHOUSE             *
o/b/o CALVIN TAYLOR, JR.
                               *     CIVIL NO. SKG-08-3136
    V.
                               *
MICHAEL J. ASTRUE,
COMMISSIONER OF THE SOCIAL     *
SECURITY ADMINISTRATION
                               *

<u>MEMORANDUM OPINION</u>

Presently pending before this Court are Cross-Motions for Summary Judgment concerning the final decision of the Commissioner of the Social Security Administration ("the Commissioner") to deny plaintiff's claim for Supplemental Security Income ("SSI"), pursuant to 42 U.S.C. § 405(g). This case has been referred to the undersigned magistrate judge with the consent of the parties pursuant to 28 U.S.C. § 636(c) and Local Rule 301.

This Court must uphold the Commissioner's decision if it is supported by substantial evidence and if proper legal standards were employed.  42 U.S.C. § 405(g); <u>Craig v. Chater</u>, 76 F.3d 585, 589 (4th Cir. 1996); <u>Blalock v. Richardson</u>, 483 F.2d 773, 774 (4th Cir. 1972).  A hearing is unnecessary.  Local Rule 105.6.

For the reasons that follow, this Court DENIES plaintiff's Motion for Summary Judgment and GRANTS defendant's Motion for Summary Judgment.

## I. Procedural History

Ms. Woodhouse originally filed an application for Supplemental Security Income ("SSI") on behalf of her nine year-old son,[1] Calvin Taylor, Jr. (hereafter "Calvin"), on August 9, 2005, alleging that Calvin was disabled as of July 5, 2005. (R. 13, 73). The Social Security Administration ("SSA") denied plaintiff's application initially and upon reconsideration. (R. 13). Thereafter, an Administrative Law Judge ("ALJ") heard the matter on April 16, 2008. As presented in a decision dated May 17, 2008, the ALJ concluded that Calvin was not disabled. (R. 13-26). The Appeals Council of the SSA denied review of the ALJ's decision. (R. 5). Therefore, the ALJ's decision is the final reviewable decision of the agency. Sims v. Apfel, 530 U.S. 103, 106-07 (2000). Plaintiff seeks review of this decision by the district court, pursuant to 42 U.S.C. § 405(g).


## II. Factual Background

---

[1] Calvin Taylor, Jr. was born on December 14, 1995. (R. 37). The eventual final decision by the ALJ on Calvin's claim was filed on May 17, 2008, at which point Calvin was twelve years old.

This Court has reviewed defendant's statement of the
facts and adopts it in full.  (Paper No. 24-1, Def.'s
Motion for Summary Judgment, 2-7).[2]

### III. ALJ Findings

Children under age 18 are considered disabled if they
have a medically determinable physical or mental impairment
or combination of impairments that both causes marked and
severe functional limitations and can be expected to cause
death or that has lasted or can be expected to last for a
continuous period of not less than 12 months.  20 C.F.R. §
416.906.  In evaluating a child applicant's disability
claim, the ALJ must follow a three step sequential
analysis.  20 C.F.R. § 416.924.

The first step of this process is determining whether
the applicant is participating in substantial gainful
activity.  20 C.F.R. § 416.924(b).  An applicant
participating in substantial gainful activity is not
eligible for SSI.  (Id.).  Substantial gainful activity is
work activity that is both substantial and the kind of work

---

[2] This Court found three differences between plaintiff's stated facts and
those provided by the defendant.  First, defendant includes much
verifiable information that plaintiff does not.  Second, while
defendant includes only Calvin's reported full-scale IQ score of 50,
plaintiff also includes information that on that same day of testing,
Calvin scored a 47 in Verbal Comprehension and a 49 in Perceptual
Reasoning.  This Court notes this information in its review of the
whole record, but standing alone these additional scores do not change
the analysis of this case.  Finally, plaintiff supplies supplemental
information pertaining to plaintiff living out of a hotel at the time
of the hearing before the ALJ.  Paper No. 18-1, 2-3.

that is usually done for pay.  20 C.F.R. § 416.972.  As one
would expect, because Calvin was only twelve years old by
the time of the hearing, in this case the ALJ determined
Calvin was not engaged in substantial gainful activity.
(R. 16).  Therefore, at step one, Calvin was still eligible
for SSI.

The ALJ then proceeded to step two - an inquiry into
whether Calvin met the requirement of having a severe
medically determinable impairment(s).  20 C.F.R. §
416.924(c).  For an impairment to be severe, an applicant
must experience more than minimal functional limitations.
(Id.).  Calvin took medication to treat his Attention
Deficit Hyperactivity Disorder ("ADHD"), doctors
recommended further treatment, and a medical consultant
opined his ADHD was severe.  (R. 16).  Therefore, the ALJ
determined that Calvin had a severe medically determinable
impairment.  (Id.).

Because the conditions in step one and two were met,
the ALJ proceeded to the third and final step in the claims
process - determining whether Calvin had an impairment(s)
that medically or functionally equaled the Social Security
disability listings.  20 C.F.R. § 416.924(d).  As evidenced
by the briefs to this Court, the ALJ's findings as to this
part of the analysis are the source of contention in this

4

case.  As such, a thorough recitation of the ALJ's findings
as to this part of the process follows.

A. Medical Equivalence:  ADHD

An impairment is medically equivalent to a SSA-
recognized impairment if it is at least equal in severity
and duration to the criteria of any listed impairment.  20
C.F.R. § 416.926(a).  In determining whether an impairment
medically equals a listing, an ALJ considers all evidence
in the case record about the impairment(s) and the effects
of those impairment(s) on an applicant.  20 C.F.R. §
416.926(c).  In the second step of the three step analysis
of the child applicant's disability benefits application,
the ALJ found that Calvin had a severe impairment of ADHD.
(R. 16).  However, the ALJ also found that the
manifestation of the severe impairment of ADHD present in
Calvin did not medically equal one of the listed
impairments.  (R. 16-19).

A child's ADHD meets the SSA listing requirements when
the child is medically documented to have developmentally
inappropriate degrees of inattention, impulsiveness, and
hyperactivity."  20 C.F.R. § 404 Subpart P App. 1 § 112.11.
For a finding of medical equivalence, the medically
documented presence of these characteristics must also lead
to a child having marked impairment or difficulties in at

least two of four age-appropriate criteria (cognitive and communicative functioning, social functioning, personal functioning, and maintaining concentration, persistence, or pace).  20 C.F.R. § 404 Subpart P App. 1 § 112.11(B); see also 20 C.F.R. § 404 Subpart P App. 1 § 112.02(B)(2) (discussing age-appropriate criteria information).  Citing abundant evidence, including a treating doctor's diagnosis of ADHD, the ALJ found that Calvin's developmentally inappropriate degrees of inattention, impulsiveness, and hyperactivity met the first part of the SSA listing for ADHD in children.  (R. 18).  However, the ALJ proceeded to find that Calvin's ADHD had not markedly impaired his functioning in any of the four age-appropriate categories. (R. 18-19).

First, the ALJ found there was less than a marked impairment in Calvin's cognitive/communicative functioning. (R. 18).  The ALJ considered that Dr. Anderson evaluated Calvin as moderately retarded and the fact that Calvin had repeated a grade.  (Id.).  In contrast, the ALJ also considered a May 2005 behavior evaluation recording that Calvin had no developmental delay or learning disability, his fourth grade report card showing generally satisfactory performance, and several references to two consultative examinations - those of Dr. Hirsch and Dr. Bogoian -

reporting Calvin's function as age-appropriate.  (Id.).
The ALJ decided that "any impairment in age appropriate
cognitive/communicative impairment is less than marked."
(Id.).

Second, the ALJ similarly concluded that Calvin's
social functioning was not markedly impaired.  Although the
ALJ noted that Dr. Anderson reported Calvin had no friends
and viewed himself a "loner," reports by two other
consultative examiners indicated that Calvin had friends he
got along with.  (R. 18-19, 206, 225, 240).  The ALJ also
cited Calvin's own testimony at the hearing about having
friends and his report card showing a "satisfactory minus"
grade in following rules as well as in working well
independently and with others.  (R. 19, 113, 253).  The ALJ
therefore decided that the record showed "less than marked"
impairment in Calvin's social functioning.  (Id.).

Third, the ALJ found that any impairment in Calvin's
personal functioning was "less than marked."  (R. 19).  The
ALJ again considered Dr. Anderson's report, referencing in
particular her note that Calvin's mother reported that he
was a "terrible behavior problem."  (R. 19, 237).  However,
the ALJ further noted Dr. Anderson reported no impairment
in Calvin's daily living activities.  (Id.).  The ALJ also
considered, and found more persuasive, the fact that

neither Dr. Hirsch nor Dr. Bogoian found any impairment in Calvin's personal functioning coupled with Calvin's testimony at the hearing that he did chores when he came home from school. (R. 19, 205-09, 223-28, 251). Thus, the ALJ concluded that Calvin's personal functioning was not markedly impaired. (R. 19).

Finally, the ALJ analyzed Calvin's difficulties in maintaining concentration, persistence, or pace, and found no marked impairment. (R. 19). As evidence that Calvin might have marked difficulties, the ALJ weighed a school report card that showed Calvin had to be reminded to stay on task, the conclusions of the SSA in a January 2006 decision that found Calvin was markedly impaired in his ability to attend to and complete tasks, and Dr. Anderson's note that Calvin at times forgot what he was doing when she was testing him. (R. 19, 114, 213, 238). Contrary to that evidence, the ALJ also observed that Calvin did not have unsatisfactory grades despite his reported trouble staying on task, that Dr. Hirsch reported Calvin was able to understand age-appropriate instructions, and that the SSA in August 2006 found no impairment in Calvin's ability to attend to and complete tasks. (R. 19, 113, 208, 232). Furthermore, the ALJ mentioned Dr. Bogoian's report finding Calvin was able to concentrate and able to understand,

remember, and carry out simple instructions though he might have slight to moderate difficulty with detailed instructions. (R. 19, 227-28). Accordingly, the ALJ ruled that "while there is some impairment maintaining concentration, persistence, or pace, it is not of such severity as to seriously interfere with the applicant's ability to independently initiate, sustain, or complete activities" and therefore any impairment in this area was "less than marked." (R. 19).

Having found four "less than marked" limitations, the ALJ concluded that Calvin's impairment did not medically equal the SSA's listing for ADHD in a child. (R. 18-19).

B. Medical Equivalence:  Mental Retardation

At the hearing, plaintiff's counsel claimed that Calvin also had the severe impairment of mental retardation - "characterized by significantly subaverage general intellectual functioning with deficits in adaptive functioning" - and that Calvin met the medical listing for mental retardation in two of six possible ways. (R. 249); 20 C.F.R. § 404 Subpart P App. 1 § 112.05.  First, plaintiff's counsel argued that Listing 112.05(c) was met because Calvin's full scale IQ score was less than 59. (R. 249).  Second, Calvin's counsel argued that he had a valid verbal, performance, or full scale IQ of 60 through 70 in

9

conjunction with ADHD having an additional and significant limitation on his functioning, thus meeting the requirements for Listing 112.05(d).  (Id.).  Finally, counsel alternatively argued that Calvin was functionally equivalent to the medical listings.  (Id.).

The ALJ ruled that, despite Calvin's IQ score of 50 which placed him at the level of "moderately mentally retarded," Calvin's alleged mental impairment was not a severe impairment and did not met the SSA listings.  (R. 16-17, 237).  The ALJ referenced numerous different sources for his finding.  Calvin himself testified that school was too hard, but that he was in the sixth grade and received a grade of "G" for good in reading that year.  (R. 17, 250). Similarly, Calvin's fourth grade report card showed he was at grade level in all subareas of school except in demonstrating knowledge of music and musicians and following safety rules and procedures in physical education class.  (R. 17, 113).  Moreover, Calvin was not placed in special education.  (R. 17, 76-77).  In May 2005, a doctor giving Calvin a behavioral evaluation recorded that Calvin did not suffer from developmental delay.  (R. 17, 194). One consultative examiner observed that Calvin was "not retarded."  (R. 17, 207).  A second examining doctor remarked in his report that Calvin had "good recent and

longterm memory" and possessed a process of thought pattern "logical, coherent, and appropriate for [Calvin's] age." (R. 17, 227).  The ALJ also referenced the Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV") in noting that those with moderate mental retardation are unlikely to progress beyond the second grade in academic subjects.  (R. 17).  Finally, the ALJ noted that Dr. Anderson, the third consultative examiner, and only consultative examiner who found the applicant to be mentally retarded, indicated that Calvin was "uncooperative" during her examination.  (R. 17, 238).

Summing up why he did not believe Calvin met the medical listing for mental retardation the ALJ concluded:

> The diagnosis of mental retardation and a full scale IQ value of 50 would satisfy the requirements of Listing 112.05C.  However, based on the contradictions in the record, the undersigned must find that while Dr. Anderson's diagnosis of mental retardation may be supported by her own examination findings and testing, significant other evidence of record shows that the applicant has no mental retardation.  The undersigned finds it particularly telling that no medical or school records even suggests mental retardation, and the applicant has for the most part performed satisfactorily in school.  Accordingly, Dr. Anderson's diagnosis of mental retardation is not consistent with other substantial evidence and is of limited probative value."

11

(R. 17).

C. <u>ALJ Findings on Functional Equivalence and the Six Domains</u>

        Having determined that Calvin's impairment did not medically equal the listing requirements, the ALJ conducted the requisite "functional equivalence" analysis to address whether Calvin's impairments functionally equaled the listed impairments.  20 C.F.R. § 416.926a(a); 20 C.F.R. § 416.929(a).  There are two facets to the development of factual findings on functional equivalence to the medical listings.  (<u>Id.</u>).  Initially, there must be an underlying medically determinable impairment(s) that could reasonably be expected to produce the applicant's pain or other symptoms.  20 C.F.R. § 416.929(b).  If such pain or symptoms from an impairment(s) are present, the subsequent inquiry is into the limiting effect on an applicant's functioning based on the intensity, persistence, and limiting effects of those symptoms.  20 C.F.R. § 416.929(c).  In children, the analytical focus is on functioning as opposed to the "Residual Functional Capacity" analysis undertaken for adult disability claims. 20 C.F.R. § 416.929(d)(4).

        A child's functioning is determined by looking at six broad areas, or "domains," in an attempt to evaluate "all

12

of what a child can or cannot do."  20 C.F.R. §

416.926a(b)(1).  Impairment(s) functionally equal listing-

level severity when they produce an "extreme" limitation in

a child applicant's functioning in one domain or "marked"

limitations in functioning in two domains.  20 C.F.R. §

416.926a(d).  "Marked" limitations are defined as the

equivalent of functioning that is two, but not three

standard deviations below the mean.  20 C.F.R. §

416.926a(e)(2).  "Extreme" limitations are defined as the

equivalent of functioning that is at least three standard

deviations below the mean. 20 C.F.R. § 416.926a(e)(3).

     The ALJ found that Calvin had "less than marked"

limitations in functioning in four domains and "no

limitation" in functioning in the remaining two domains.

(R. 19-26).  In so finding, the ALJ indicated that he

considered all symptoms and the extent to which those

symptoms could be reasonably accepted as consistent with

objective medical and other evidence based on the

requirements of 20 C.F.R. § 416.929 and Social Security

Rulings ("SSRs") 96-4p and 96-7p.  (R. 19).  The ALJ also

reported considering opinion evidence in accordance with 20

C.F.R. § 416.927 and SSRs 96-2p, 96-5p, 96-6p, and 06-3p.

(R. 19).

          ALJ Finding on "Acquiring and Using Information"

13

For disability benefits application purposes, the SSA
holds that elementary and middle school students, like
Calvin, should be able to read, write, do math, and discuss
history and science at an age-appropriate level in both
academic situations and daily living situations.  20 C.F.R.
§ 416.926a(g)(2)(iv).  In making a finding as to Calvin's
functioning in "acquiring and using information," the ALJ
correctly utilized this standard for his analysis.  (R. 20-
21).  The ALJ noted that Calvin was in sixth grade, had
received a "G" grade in reading, was not receiving any
extra help, and the opinions of several examining doctors
that Calvin had significant ability to retain information
and a lack of mental retardation.  (R. 21).  The ALJ
acknowledged Dr. Anderson's report that Calvin had an IQ
score of 50, but found Dr. Anderson's diagnosis of mental
retardation to be "not consistent with substantial
evidence" and of "limited probative value."  (Id.).  As a
result, the ALJ found a "less than marked" limitation in
his ability to acquire and use information.  (Id.).

<u>"Attending and Completing Tasks"</u>

In evaluating disability benefits applications, SSA
regulations provide that in attending and completing tasks,
children of Calvin's age should be able to focus their
attention to follow directions in a variety of situations

including at school, at home, and in the community.   20
C.F.R. § 416.926a(h)(2)(iv).

In applying this standard to Calvin, the ALJ
recognized that Dr. Anderson's report stated that Calvin
would forget what he was doing on a task.  (R. 22, 238).
Additionally, the ALJ cited Dr. Bogoian's description of
Calvin as being able to concentrate and understand,
remember, and carry out simple instructions although he
might have slight to moderate difficulty with detailed
instructions.  (R. 22, 227).   The ALJ acknowledged two
conflicting SSA decisions on whether Calvin had a marked
impairment in this domain. (R. 22).   Despite not finding
Calvin to be disabled, the SSA initially found that Calvin
had a "marked" limitation in attending and completing
tasks.  (R. 213).  However, upon reconsideration of
Calvin's application in August 2006, a different claims
examiner found "no limitation" in this domain because
Calvin's medication had improved the situation.  (R. 232,
235).[3]  Departing from both agency findings, the ALJ found
Calvin had a "less than marked" limitation in this area.
(R. 23).

---

[3] Calvin's functioning showed improvement after he began taking
Adderall.  (R. 226, 235).  If a symptom can be reasonably controlled by
medication, it is not disabling.  Gross v. Heckler, 785 F. 2d 1163,
1166 (4th Cir. 1986).

"Interacting and Relating with Others"

The "interacting and relating with others" domain considers the ability of children to initiate and sustain emotional connections with others, develop and use the language of their community, cooperate with others, comply with rules, respond to criticism, and respect and take care of the possessions of others.  20 C.F.R. § 416.926a(i).

In determining that Calvin's limitation in interacting and relating with others was less than marked, the ALJ considered Dr. Anderson's report that Calvin had no friends, saw himself as a loner, and had gotten into a fight at school. (R. 23, 240).  However, the ALJ also noted two other doctors' reports that Calvin had friends and Calvin's own testimony about having friends.  (R. 23, 206, 225, 253).  The ALJ was also persuaded by the fact that Calvin's report card showed a passing grade ("S-" or "satisfactory minus") in "the ability to follow rules and work well independently and with others."  (R. 23-24, 113).[4] As a result, the ALJ found that Calvin's limitation in interacting and relating with others was "less than marked."  (R. 23).

Other domains:  "Moving around and Manipulating Objects," "Caring for Yourself," and "Health and Physical Well-Being"

---

[4] The report card shows a grading key of "S" for "satisfactory" and "U" for "unsatisfactory" in this area.  (R. 113).

At the April 2008 hearing in front of the ALJ, plaintiff's counsel indicated that three domains might be implicated by Calvin's alleged impairments - acquiring and using information, attending and completing tasks, and a third domain for "conduct issues" (presumably this would be interacting and relating with others).  (R. 249). Accordingly, as to the domains of "health and physical well-being" and "moving around and manipulating objects," on the basis that the record contained no assertions that Calvin's functioning was impacted in these ways, the ALJ found "no limitation" on functioning.  (R. 24, 26).

However, despite no assertions in the record on this point, the ALJ did study the record closely as to Calvin's ability to care for himself, finding his functioning was limited in this area, but that the limitation was "less than marked."  (R. 25).  Under this domain, considerations include how well a child maintains a healthy emotional and physical state, including how appropriately the child's physical and emotional wants and needs are met; how a child copes with stress and changes in his or her environment; and whether the child can take care of his or her own health, possessions, and living area.  20 C.F.R. § 416.926a(k).

As stated by the ALJ, Calvin was required to take
Adderall for his ADHD and the initial agency decision on
his application found a "less than marked" limitation on
this area of functioning. (R. 25). Moreover the ALJ noted
that the record lacks any other evidence that showed Calvin
had any trouble caring for himself relative to his age.
(Id.). Calvin did not say that he was unable to take care
of himself, and the SSA's decision on reconsideration
application found "no limitation" on his functioning in
this domain. (Id.). Therefore, the ALJ found there was a
limitation, but that it was "less than marked." (Id.).

## IV. Standard of Review

In reviewing final decisions of the Commissioner, this
Court has the authority to affirm the agency decision,
modify it, reverse it, or remand it back to the agency. 42
U.S.C. § 405(g); Melkonyan v. Sullivan, 501 U.S. 89, 98
(1991). The role of this Court in determining which of
these actions to take in a given case is shaped by a
determination of whether the agency's decision is supported
by substantial evidence. 42 U.S.C. § 405(g); Richardson v.
Perales, 402 U.S. 389 (1971).

The Social Security Act precludes this Court from
engaging in a de novo judicial review of the case, but
rather requires the Court to uphold the agency decision if

it is supported by "substantial evidence" – even if the
Court disagrees with the result.  <u>King v. Califano</u>, 599
F.2d 597, 599 (4th Cir. 1979) ("This Court does not find
facts or try the case de novo when reviewing disability
determinations."); <u>Blalock v. Richardson</u>, 483 F.2d 773, 775
(4th Cir. 1972) (citations omitted); <u>Underwood v. Ribicoff</u>,
298 F.2d 850 (4th Cir. 1962) (holding that if the
Commissioner's findings are supported by substantial
evidence, they are binding on the Court).  "Substantial
evidence" is defined as "evidence which a reasoning mind
would accept as sufficient to support a particular
conclusion . . . more than a mere scintilla of evidence but
may be somewhat less than a preponderance."  <u>Laws v.
Celebrezze</u>, 368 F.2d 640, 642 (4th Cir. 1966).  In
determining whether there is substantial evidence, this
Court may not weigh conflicting evidence, determine
credibility, or substitute its judgment for that of the
Commissioner.  <u>Hays v. Sullivan</u>, 907 F.2d 1453, 1456 (4th
Cir. 1990).  "The duty to resolve conflicts in the evidence
rests with the ALJ, not with a reviewing court."  <u>Smith v.
Chater</u>, 99 F.3d 635, 638 (4th Cir. 1996); <u>citing</u> <u>Kasey v.
Sullivan</u>, 3 F.3d 75, 79 (4th Cir. 1993).

     Despite the general principle requiring the Court to
give deference to the Commissioner's factual findings, "a

factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." <u>Coffman v. Bowen</u>, 829 F.2d 514, 517 (4th Cir. 1987). Therefore, this Court will review the decision in this case to ensure that substantial evidence supports the fact-based agency decision and that the factual findings were reached by proper standards and application of the law.

**V. Discussion**

<u>A. Dr. Hirsch's Consultative Examination did not prejudice Calvin's Claim because the ALJ applied the correct standards and Properly Relied on Dr. Hirsch's Examination as Medical Evidence</u>

Plaintiff alleges that Dr. Hirsch, one of the consultative examiners for this claim, prejudiced Calvin's claim by erroneously evaluating him under the standards for adult disability claims.[5]  (Paper No. 18-1, 6).  Plaintiff asserts "Dr. Hirsch fatuously indicated that Taylor was unsuitable to handle any benefit funds."  (<u>Id.</u>); (<u>citing</u> R. 209).  Furthermore, in a letter urging the Appeals Council to remand the case to the ALJ, plaintiff's counsel alleges that, "Dr. Hirsch's psychiatric Consultative Exam is always

---

[5] Because it does not affect the determination of this case, this Court offers no opinion on the parties' theories regarding whether practically-speaking child applicants face a stricter disability benefits eligibility standard than adults.  (Paper No. 18-1, 3, 6); (Paper No. 24-1, 17).  If Dr. Hirsch did utilize the purportedly lower adult standard, that, of course, would inure to the claimant's benefit, not detriment.

a joke because he sees no difference in evaluating adults and children." (R. 242).

First, conclusory allegations and ad hominem attacks unsubstantiated by facts cannot be grounds for relief and do not influence this Court. Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007). The only evidence plaintiff cites in an attempt to advance this argument is a passing reference to a sentence in the "Capability of Handling Funds" section of Dr. Hirsch's report. (Paper No. 18, 6; R. 209). The record reflects that Dr. Hirsch noted that any benefits awarded in this case "would need to come in Calvin Taylor's name to some appropriate guardian because of his personal chronological immaturity." (R. 209). It is not clear how this proves Dr. Hirsch evaluated Calvin like an adult. Moreover, Dr. Hirsch's examination report also contains at least three references to Calvin's behavior and functioning as being "age-appropriate" and a reference to Calvin as being "10 years of age." (R. 206-08). A careful review of the record finds no evidence substantiating plaintiff's assertion.

Second, if plaintiff is alleging that Dr. Hirsch evaluated Calvin under the now-outdated "comparable severity" standard, this concern is not articulated and nothing in the record supports this view. See 62 F.R.

21

6408, 6411 (SSA in a notice describing the 1996 shift from the comparable severity standard to a three-part process for analyzing childhood disability benefits applications); (Paper No. 18) (no mention of comparable severity).

Third, even if Dr. Hirsch examined Calvin under an erroneous standard, this was not reflected in the ALJ's decision as the record is clear that the ALJ applied the correct three-step process for evaluating child SSI claims. (R. 13-26).  Indeed, the ALJ, not a consultative examiner, must decide the merits of a disability benefits application.  20 C.F.R. § 416.927(f)(2) (establishing that ALJs must consider information from consultative examinations, but are not bound by them).  At a hearing before an ALJ, a consultative examination is only persuasive as another piece of evidence.  26 U.S.C. § 416.926(e) ("For cases at the administrative law judge or Appeals Council level, the responsibility for deciding medical equivalence rests with the administrative law judge or Appeals Council."); 26 U.S.C. § 416.926a(n) ("For cases at the administrative law judge or Appeals Council level, the responsibility for deciding functional equivalence rests with the administrative law judge or Appeals Council.").  Thus, a consultative examiner's application of an incorrect standard goes to the weight of his report.

22

The ALJ's use of Dr. Hirsch's examination, even if Dr. Hirsch employed an incorrect legal standard, did not prejudice plaintiff here, particularly in light of the ALJ's reliance on the examination as just one piece of evidence,[6] and his clear articulation of the proper legal standard.

## II. The ALJ relied on substantial evidence when finding Calvin's impairment did not medically equal the medical listing for mental retardation

Plaintiff alleges that it was clear error for the ALJ to disregard Calvin's IQ test results and Dr. Anderson's consultative examination report when there was no other objective standardized testing done on Calvin's mental abilities.[7]  (Paper No. 18-1, 4-6.)  Defendant argues that there was substantial evidence upon which the ALJ relied in determining that Calvin was not mentally retarded, including objective testing consisting of mental status

---

[6] Dr. Hirsch's report was only one of four pieces of evidence used in the initial denial of Calvin's claim.  (R. 38, 210-14).  On reconsideration, Calvin's claim was denied but with more information and medical opinions, including a new consultative exam, so that Dr. Hirsch's report would have had even less importance.  (R. 44).  By the time the ALJ reviewed the case, a third consultative examination was in the record.  (R. 236-41).

[7] Plaintiff does not allege that the record was incomplete and this Court does not find that any duty to develop is implicated.  It might have been prudent to order a second IQ test after Dr. Anderson found Calvin to be mentally retarded.  However, there was no requirement that the ALJ do so because there was already substantial evidence in the record on this issue.  See Simmons v. Astrue, 2009 WL 234315, *5 (W.D. Va. 2009) ("The fact that the ALJ gave little weight to the opinions of Dr. White does not create a duty to seek additional information in an attempt to find her opinions to be credible").

examinations and gross neurological testing by other consultative examiners.  (Paper No. 24-1, 11-15).

The underlying basis for Calvin's original SSI claim was the disabling effect of ADHD on his life, but Calvin's ADHD was twice determined not to be medically or functionally equal in severity to the applicable SSA listings before his hearing.  (R. 38, 44).[8]  Prior to the ALJ's decision, but after the two denials of his benefits application by the SSA, Calvin scored a 50 on an IQ test administered by Dr. Anderson, which would categorize him as "disabled" by definition under the medical listings.  (R. 237); 20 C.F.R. § 404 Subpart P App. 1 § 112.05. Nevertheless, the ALJ concluded that Dr. Anderson's test results and subsequent diagnosis of mental retardation were inconsistent with other substantial evidence and of limited probative value.  (R. 17).  As a result, the ALJ determined Calvin's impairment was not medically equivalent to the SSA listings for mental retardation (Listing 112.05).  (R. 16-17).

Listing 112.05 states that mental retardation is:

---

[8]Similarly, the ALJ found that Calvin's ADHD did not result in medical or functional equivalence to the severity required by SSA listings. (R. 18-19).  These ADHD-specific findings were supported by substantial evidence and were not challenged by the plaintiff so this Court finds no reason to disturb them.  See (Paper No. 18-1, 4-7) (containing no references to ADHD anywhere in plaintiff's argument); (R. 18-26) (ALJ citing substantial evidence in making these findings).

> Characterized by significantly
> subaverage general intellectual
> functioning with deficits in adaptive
> functioning.  The required level of
> severity for this disorder is met when
> the requirements in A, B, C, D, E, or F
> are satisfied… (C) A valid verbal,
> performance, or full scale IQ of 59 or
> less...

20 C.F.R. § 404 Subpart P App. 1 § 112.05.  Because Calvin

has an IQ score of 50, he would appear to meet the severity

requirement of Listing 112.05(C) under the regulations.

However, other sections of the regulations are also

relevant to the severity determination.

20 C.F.R. § 404 Subpart P App. 1 § 112.00(A) provides:

> Listing 112.05 (Mental Retardation)
> contains six sets of criteria.  If an
> impairment satisfies the diagnostic
> description in the introductory
> paragraph _and_ any one of the six sets
> of criteria, we will find that the
> child's impairment meets the listing.
> (emphasis added).

So while it is clear that Calvin's impairment met one

of the six sets of criteria - (C) - the ALJ essentially

found that he did not meet the diagnostic description in

the introductory paragraph.  That paragraph states that

mental retardation is "characterized by significantly

subaverage general intellectual functioning with deficits

in adoptive functioning."  112.05.  Both the test in the

introductory paragraph and the one of the seven sets of criteria must be met.  Blakes v. Barnhart, 331 F.3d 565, 570 (7th Cir. 2003) (noting that in 2001 the SSA listings for mental retardation in children were amended to require a two-part analysis which included a requirement that the introductory paragraph was met).  See also Social Security Acquiescence Rul. 03-1(7), 68 Fed. Reg. 74279, 74280 (2003) "the diagnostic description of mental retardation contained in the introductory paragraph of these Listings, or 'capsule definition,' is an integral part of their criteria").  The ALJ clearly analyzed, and discussed the adaptive functioning of Calvin, which he found to be higher than might be suggested by the bare test scores.

Moreover, an ALJ is not bound to blindly accept IQ tests, but is to assess their validity.  112.00(D)(8) charges an ALJ in his evaluation of mental disorders in children "to note and resolve any discrepancies between formal test results and a child's customary behavior and daily activities."  20 C.F.R. § 404 Subpart P App. 1 § 112.00(D)(8).  Thus, the ALJ here properly looked beyond just the raw scores, as the regulations direct.

Beyond regulations specifically pertaining to the mental retardation listing, other applicable regulations generally establish that in making a finding on medical

equivalence to the SSA listings, an ALJ should consider
evidence beyond test scores.  The regulation providing the
framework for addressing medical equivalence for adults and
children explicitly states that all relevant information in
the case record is considered in determining if an
impairment medically equals a listing.  20 C.F.R. §
416.926(c).  Also, an ALJ must consider medical opinions,
such as Dr. Anderson's consultative examination report
analyzing the IQ test she gave Calvin, "together with the
rest of the relevant evidence."  20 C.F.R. § 416.927(b).
In cases like the present one where there are conflicts in
the evidence and differing medical opinions, ALJs have the
duty to resolve those conflicts and the corresponding
ability to disagree with a medical opinion, so long as
substantial evidence supports the position the ALJ takes.
Johnson v. Barnhart, 434 F.3d 650 (4th Cir. 2005); Murphy
v. Bowen, 810 F.2d 433, 438 (4th Cir. 1987) (ALJs are
required to resolve evidentiary conflicts in the record);
SSR 96-2p.[9]

---

[9] In this case, the reports of the three consultative examiners clearly
conflict as to the issue of whether Calvin is mentally retarded with
Drs. Hirsch and Bogoian believing he is not and Dr. Anderson believing
he is mentally retarded.  (R. 207, 227, 240).  Undoubtedly, given these
three conflicting medical opinions none of which is a treater, it was
up to the ALJ to determine which opinion was most supported by
substantial evidence.  20 C.F.R. § 416.927(f) (stating ALJs are
responsible for making credibility determinations and decisions on how
much weight to give medical opinions).

There is no controlling case law in the Fourth Circuit
on whether an IQ test score can be disregarded in the
absence of another IQ test score in the record.
Nonetheless, at least six other circuits have held that an
IQ test score can be disregarded as proof of mental
retardation even without evidence of another IQ test in the
record.  See Lax v. Astrue, 489 F.3d 1080 (10th Cir. 2007)
(affirmed ALJ decision that applicant's IQ scores were not
an accurate measurement of his functioning rather than
remanding for new sets of IQ tests); Markle v. Barnhart,
324 F.3d 182, 187 (3rd Cir. 2003) (noting an ALJ can reject
IQ scores that are inconsistent with the record but holding
that in that case the record did not support the ALJ's
decision); Clark v. Apfel, 141 F.3d 1253, 1255 (8th Cir.
1998) ("Commissioner is not required to accept a
applicant's I.Q. scores, however, and may reject scores
that are inconsistent with the record."); Muse v. Sullivan,
925 F.2d 785 (5th Cir. 1991) (finding there was substantial
evidence, including one physician's report finding no
mental retardation, that supported the ALJ's finding of no
retardation despite two other physicians' reports with IQ
scores indicating retardation).  See also Popp v. Heckler,
779 F.2d 1497, 1499 (11th Cir. 1986) (holding that test
results should be examined to assure consistency with daily

28

activities and behavior); Strunk v. Heckler, 732 F.2d 1357, 1360 (7th Cir. 1984) ("The plaintiff has failed to supply this court, nor have we found any case law requiring the Secretary to make a finding of mental retardation based *solely* upon the results of a standardized intelligence test").

With that said, the ALJ could not simply disregard Calvin's IQ scores without relying on substantial evidence supporting the lack of mental retardation.  McLain v. Schweiker, 715 F.2d 866, 869 (4th Cir. 1983) ("Objective medical tests and doctor's opinions are a major part of the proof to be considered in disability cases that an ALJ must take into consideration").  The Fourth Circuit has reversed an ALJ's decision on mental retardation where the ALJ cited insufficient evidence for considering IQ scores to be invalid.  Mitchell v. Schweiker, 699 F.2d 185 (4th Cir. 1983) (reversing ALJ's decision because the ALJ did not cite substantial evidence to disregard significant evidence indicating that the claimant was mentally retarded, including a treating doctor's evaluation that the applicant's IQ was about 58).[10]  Similarly, this circuit has reversed cases upon finding an ALJ failed to develop the

---

[10]In this case, Dr. Anderson's opinion, like the opinions of Dr. Hirsch and Dr. Bogoian, is given the weight of an examining doctor's opinion, not the heightened standard of a treating physician's opinion.

record as to whether a claimant had mental retardation.
See e.g., Cook v. Heckler, 783 F.2d 1168 (4th Cir. 1986)
(reversing because the ALJ did not fulfill the duty to
develop the record on the issue of mental retardation, with
the Court noting that standardized testing was one way in
which that duty could have been met).

These cases do not apply to the present case.
Throughout his decision, the ALJ directly cited to the
record to support his conclusion that Calvin was not
mentally retarded.[11]   See (R. 13-26).   Though agreeing with
plaintiff's counsel that other consultative examiners did
not conduct formal IQ testing,[12] the ALJ immediately
thereafter noted that Dr. Bogoian and Dr. Hirsch "are
medical specialists in their field and they did not find
even a suggestion of retardation."   (R. 17).[13]

---

[11]It is clear from the ALJ's decision that he concluded Calvin was not
even mildly mentally retarded, which is important because this shows
the ALJ considered whether Calvin met Listing 112.05(D).   Cf.
Schoofield v. Barnhart, 220 F. Supp. 2d 512, 522 (D. Md. 2002)
(reversing ALJ's finding that the claimant was not disabled because the
ALJ improperly disregarded the opinions of treating physicians and did
not specify which medical listings he considered in his review).
Moreover, when ADHD is controlled by medication, it cannot qualify as
the required additional and significant limitation under Listing
112.05(D).   Pepper v. Barnhart, 342 F.3d 853, 855 (8th Cir. 2003).
[12]Defining what is "formal testing" is inconsequential here, because
what matters is whether there was substantial evidence in the record
upon which the ALJ relied in finding Calvin was not mentally retarded.
[13]At one point in his report, Dr. Bogoian did write that "[t]argeted
neuropsychological testing may help clarify an underlying etiology, and
learning disabilities" in Calvin.   (R. 227).   The context of this
statement suggests it was made in reference to certain manifestations
of Calvin's ADHD rather than his intellectual functioning.   Moreover,
this Court recognizes that "learning disabilities" are different than

Specifically, the ALJ did note that Dr. Hirsch performed a "Mental Status Examination" and found that Calvin was "not retarded" and further that Dr. Bogoian similarly performed a "Mental Status Examination" and reported that Calvin had a good memory and a stream of thought pattern appropriate for his age. (R. 17, 207, 227). The ALJ also referenced a May 2005 behavioral evaluation of Calvin,[14] done by a doctor at Johns Hopkins Community Physicians, which specifically noted Calvin was experiencing no developmental delay.[15] (R. 18, 194). The ALJ also considered that Calvin was not placed in special education classes.[16] (R. 17).

---

"mental retardation." National Center for Learning Disabilities, 2009: The State of Learning Disabilities, 5 (2009) (learning disabilities are not caused by low intelligence or mental retardation). As such, Dr. Bogoian's statement suggesting Calvin should get tested for learning disabilities is not understood as a suggestion that Calvin might be mentally retarded; his remark regarding "neuropsychological testing" is less clear.

[14] Calvin allegedly became disabled on July 5, 2005. (R. 73). Although the behavior evaluation in May 2005 took place prior to this date this evidence is still relevant and information the ALJ must consider. Corcoran v. Astrue, 2009 WL 3100350, *13, Civ. No. SKG-08-913 (D. Md. 2009); Carpenter v. Astrue, 537 F.3d 1264 (10th Cir. 2008); Vandenboom v. Barnhart, 421 F.3d 745, 750 (8th Cir. 2005) ("there is no valid reason to exclude consideration of medical records dated prior to [the applicant's] alleged date of onset"); 20 C.F.R. § 404.1520(a)(3).

[15] This information is in the "History" portion of the doctor's report so it is possible that this information was recorded based on prior evaluation done by Johns Hopkins Community Physicians or information supplied to the doctor about testing done by the Baltimore school system. At one point Calvin was tested for "behavioral or learning problems" but afterwards the school system did not move Calvin into special education. (R. 77).

[16] Similar to IQ test results, the information that Calvin was not placed in special education is only persuasive and not dispositive. See 20 C.F.R. § 416.924a(b)(7)(iv) ("The fact that you do or do not receive special education services does not, in itself, establish your actual limitations or abilities").

In the process of finding Calvin did not meet the medical listings for mental retardation, the ALJ not only indicated why he thought Dr. Anderson's report was of limited probative value, but he also cited abundant information for his finding that Calvin was not mentally retarded.  Because the ALJ examined an outside evaluation finding no developmental disability in Calvin, mental status examinations by two consultative examiners finding Calvin's mental functioning was age-appropriate and that he was not mentally retarded, Calvin's school record that he was functioning at grade level without extra help, and Calvin's personal testimony, this Court concludes that there is substantial evidence for the ALJ's decision finding no mental retardation.  (R. 13-26, 76-77, 113, 194, 206-08, 227, 249-253).

Accordingly, given the evidence in the record of Calvin's general intellectual and adaptive functioning higher than associated with the functioning expected from the IQ test results, the ALJ did not have to find based on Calvin's reported IQ of 50 that he was medically equivalent to Listing 112.05.

III. <u>The ALJ also relied on substantial evidence when finding Calvin did not functionally equal the medical listing for mental retardation</u>

It is unclear whether the plaintiff challenges the ALJ's findings on functional equivalence, because in briefing to this Court the plaintiff does not specifically challenge any of the six specific domains making up the functional equivalence analysis or state that Calvin should be found functionally equivalent to the medical listing for mental retardation.  (Paper No. 18-1).  However, even if the plaintiff had, the ALJ clearly undertook a full and rigorous evaluation as to whether Calvin's impairment was functionally equivalent to the mental retardation listings. (R. 20-26).  In making findings on the six domains, the ALJ cited to much of the same evidence he utilized in making a finding on lack of medical equivalence and in some cases included additional information.  (Id.).  As required, the ALJ incorporated into his analysis the report of Dr. Anderson with the disputed IQ score results.  (Id.). Moreover, the strong authority from other circuits noted previously in the context of medical equivalence, applies in this context as well.  Low IQ test scores alone do not require a finding of a marked or extreme limitation in domains such as "acquiring and using information."

Furthermore, federal regulations state with even greater specificity in the context of functional equivalence than in medical equivalence, that an IQ score

33

alone should not be considered dispositive.  See 20 C.F.R.

§ 416.924a(a)(1)(ii); 20 C.F.R. § 416.926a(e)(4).

> [W]e may find that you do not have a
> 'marked' or 'extreme' limitation, even
> if your test scores are at the level
> provided in paragraph (e)(2) or (e)(3)
> of this section [respectively, two or
> three standard deviations below the
> norm], if other information in your
> case record shows that your functioning
> in day-to-day activities is not
> seriously or very seriously limited by
> your impairment(s).  For example, you
> may have a valid IQ score below the
> level in paragraph (e)(2), but other
> evidence shows that you have learned to
> drive a car, shop independently, and
> read books near your expected grade
> level.

20 C.F.R. § 416.926a(e)ii)(B).

Throughout his decision, the ALJ repeatedly referred

back to the record to Calvin's satisfactory or better

grades in normal education reading classes at his grade-

level.  See (R. 16, 17, 21).  The Court finds this evidence

to be particularly striking when analyzed in the context of

20 C.F.R. § 416.926a and so affirms the ALJ's finding that

Calvin did not functionally equal the SSA listing for

mental retardation in children.

**Conclusion**

For the foregoing reasons the Court affirms the agency

ruling and GRANTS defendant Social Security

Administration's motion for summary judgment.  Plaintiff

Victoria Woodhouse's motion for summary judgment is DENIED.


\_\_2/5/10_____                _____/s/_____
        Date                    Susan K. Gauvey
                                United States Magistrate Judge